AUSA: Andrew Picek      Telephone: (313) 226-9100
Task Force Officer: Theodore Copley, ATF      Telephone: (313) 202-3400

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America

v.

D-1 Roland Terrell Chatmon,
D-2 Leica Doreen Lopez Martinez,
D-3 Ieasha Ann Stroman,
D-4 Dnequia Jenise Stroman, and
D-5 Kenneth Paul Anderson

Case: 2:25−mj−30612
Assigned To : Unassigned
Assign. Date : 9/25/2025
Description: CMP USA v Chatmon et al. (SH)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _August 31, 2025, and September 1, 2025,_ in the county of _Wayne and Oakland_ in the _Eastern_ District of _Michigan_, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201(c) | Conspiracy to Commit Kidnapping. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Theodore L. Copley, Task Force Officer, ATF
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _September 25, 2025_

_____
*Judge's signature*

City and state: _Detroit, MI_

Hon. Anthony P. Patti, U.S. Magistrated Judge
*Printed name and title*

## AFFIDAVIT

I, Theodore L. Copley, being duly sworn, depose and state the following:

## I.    INTRODUCTION

1.    I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been since March of 2023. As a Task Force Officer with ATF, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law. I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. I am also a Certified Fire Investigator/Lieutenant with the Detroit Fire Department (DFD), where I have been assigned to the Fire Investigation Unit/Detroit Arson Task Force since 2015.

2.    As an ATF Task Force Officer, I have completed the Task Force Officer Training Program, where I received training in the investigation of federal crimes involving firearms, narcotics, arson, and explosives. I am currently assigned to the ATF Detroit Field Division – Group III and am primarily responsible for the investigation of arson and violent crime. I currently hold the designations of Certified Fire Investigator (CFI) and Certified Evidence Collection Technician (ECT) through the International Association of Arson Investigators (IAAI), and

1

Certified Fire and Explosion Investigator (CFEI) through the National Association

of Fire Investigators (NAFI). Additionally, I am a Michigan Commission on Law

Enforcement Standards (MCOLS) Certified Police Officer with the City of Detroit.

I have attended many trainings pertaining to fire investigation as well as other

criminal investigation tactics. I have attended many trainings pertaining to fire

investigation, and I have participated in numerous arrest and seizure warrants

involving a variety of offenses, including violations pertaining to homicide, arsons,

and many other crimes. I have personally reviewed reports and documentation,

observed scene photographs, and have had conversations with employees at the

ATF and other law enforcement agencies in regard to the offenses referred to

below. I am familiar with the facts and circumstances of this investigation.

3.     The ATF is currently conducting a criminal investigation concerning a

conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) committed by

D-1 Roland Terrell CHATMON, D-2 Leica LOPEZ MARTINEZ, D-3 Ieasha Ann

STROMAN, D-4 Dnequia Jenise STROMAN, and D-5 Kenneth Paul

ANDERSON.

4.     This affidavit is intended to show probable cause that the defendants

all conspired and agreed to unlawfully seize, confine, kidnap, abduct, and carry

away and hold Victim 1 and Victim 2, for the purpose of obtaining cash, money

from Victim 1's bank accounts, and other personal property, by using any means,

facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, and that each of the defendants did any overt act to effect the object of this conspiracy.

## II.   PROBABLE CAUSE

5.     On or about August 15, 2025, Victim 1 encountered a social media influencer who was pretending to be blind outside a pawn shop in Detroit. Victim 1 helped the influencer, who then revealed his true identity and gifted Victim 1 cash. The influencer then posted video of these events to social media sites and started a crowdfunding campaign to raise additional money for Victim 1. The crowdfunding campaign raised over $100,000. On or about August 21, the influencer gave the money raised through the crowdfunding campaign and a vehicle to Victim 1 and posted another video to social media sites showing these events.

**CHATMON Discusses Victim 1's Financial Windfall in Jail Calls**

6.     Roland Terrell CHATMON is Victim 1 and Victim 2's nephew. (CHATMON's mother and Victim 2 are sisters). Ieasha STROMAN and Dnequia STROMAN are married. Dnequia STROMAN may also be related to CHATMON (based upon recorded jail calls between CHATMON and his brother).

7.     CHATMON's brother is currently serving a jail term in the Wayne County jail and regularly speaks to CHATMON on phone calls from the jail, which are recorded. Agents reviewed calls between CHATMON and his brother made

between August 16, 2025, and September 15, 2025. (The following quotes are not intended to be a verbatim transcription and are made to the best of this and other agents' ability to hear and understand the recordings).

8.      On August 20, 2025, CHATMON's brother called him from jail. His brother mentioned speaking to their mother, and stated, "this n**** got 100,000 and shit." CHATMON told his brother they also gave Victim 1 a new car and that it went "viral." CHATMON said he didn't know if Victim 1 was going to get $100,000, but they did a "GoFundMe" for him.

9.      On August 21, 2025, CHATMON told his brother, "They done gave this n**** [Victim 1] a $100,000 bra. . . . I said that n**** better not make me turn a hustle." CHATMON said that Victim 1 received a brand-new car, a "crib," and "100 racks."

10.     On August 22, 2025, CHATMON stated to his brother that he was "trying to figure some shit out," because he had to borrow some "cheese." CHATMON stated he was struggling, and that, "I need some racks real quick. I'm tired of this shit."

11.     On August 24, 2024, CHATMON spoke to his brother. During the call, CHATMON connected their mother, so that all three could speak. Their mother discussed Victim 1 getting $100,000, and how the influencer was going to get Victim 1 a car and help with a "crib" in the next week. She noted that the

4

"GoFundMe" account had $100,000 in it for Victim 1, and that Victim 1 had $6,000 in his hand. Their mother then made a disparaging comment about Victim 1 and Victim 2. The conversation continued:

CHATMON: Hey bra. Hey bra.

CHATMON: *laugh*

Brother: *laugh*

Mother: That ain't funny.

Brother: Hey Twin. . . . Ma, you don't even know what he was about to say. I was about to say, "Twin, it's time to come out of retirement."

Mother: I know what he was about to say. That's my son.

CHATMON: Yeah, she know bra. I'm going to get it.

Brother: Twin, it's time to come out of retirement baby.

CHATMON: Hey man, I can get a couple a portions of them dollars.

Mother: Who do?

CHATMON: I can.

Mother: From who?

CHATMON: *laugh* From them.

Mother: *laugh*

Brother: *laugh*

| Brother: | Them, goddamnit. |
| CHATMON: | Mom, I'm saying though, I can figure it out. |
| Brother: | Definitely can figure it out. |
| CHATMON: | Ma, faster than ya'll gambling, I be done got a good ten." |
| CHATMON: | *laugh* |
| Brother: | *laugh* |
| Mother: | Y'all get tough real quick |

CHATMON's brother then asked about the last time CHATMON and their mother had seen Victim 1 and Victim 2. Their mother mentioned a recent family reunion. The conversation then continued:

| CHATMON: | Can I use that "pot," and I can get us a good $10,000. |

* * *

| Brother: | Put your pistol back in its got damn, what's its name Skud? |
| CHATMON: | You hear me, cuz? Hey, I was Billy the Kid right there tho. |
| Brother: | Better put that bitch back in the holster. |

**September 1, 2025 Kidnapping of Victim 1 and Victim 2**

12.     On September 1, 2025, Detroit Police began investigating a reported kidnapping and home invasion that occurred at multiple locations in Detroit. The

6

investigation started when Detroit Police responded to a reported home invasion in Southwest Detroit, at Victim 1 and Victim 2's home, where Victim 2 reported two armed individuals entered her home, pointed a gun at her, tied her up, and stole a safe. Detroit Police also responded to a vehicle fire on the east side of Detroit, where Victim 1 was found tied up on the ground near his GMC Yukon Denali that was engulfed in flames.

13.    Victim 1 reported to Detroit Police that he was robbed at gunpoint, tied up in the back of his own vehicle, and driven to multiple locations, including ATMs, where the suspects attempted to and/or withdrew money from his accounts. Victim 1 also reported he was driven to his home to steal a safe. At his home, the suspects entered the home, tied up the victim's wife, Victim 2, and stole a safe. Later, Victim 1 was left on the ground tied up by his vehicle and his vehicle set on fire.

14.    After subsequent interviews with Victim 1, law enforcement learned that Victim 1 initially picked up a female, later identified as Leica LOPEZ MARTINEZ, on Vernor Ave., Detroit, Michigan. Victim 1 reported that the female approached him as he backed into a parking space near his home and told him that her car had just been taken. Victim 1 agreed to give her a ride and she got into his car.

7

15.     Victim 1 stated he drove the female to the area of Filer Ave. on the east side of Detroit. She used GPS to tell Victim 1 where to turn. Victim 1 then parked on Filer Ave.

16.     After parking on Filer Ave., Victim 1 reported that additional male and female suspects appeared and held him at gunpoint, bound his hands and feet, and placed a shirt over his head. The additional suspects demanded "money or they would kill his wife." Victim 1 stated the suspects then threw him into the back of the GMC Yukon. The unknown suspects took his cellular phone, keys to his home, his Bank of America Card, and possibly his Cash App Card.

17.     Suspect 1 and the other suspects then drove Victim 1 to multiple locations, including his home. Victim 1 also reported that he believed a white Honda or Mazda was following the GMC Yukon during the incident.

18.     Victim 1's wife, Victim 2, reported that at approximately 4:00 a.m., she woke up to find that Victim 1 was gone. Victim 2 tried to contact Victim 1 with no response and waited for him to return home. At approximately 5:00 a.m., two suspects, described by Victim 2 as male and female, entered the apartment wearing masks and holding handguns. The suspects asked Victim 2, "Where is the money?" The male grabbed the safe, while the female held Victim 2 at gunpoint. The suspects tied and bound Victim 2's extremities and fled the apartment. Victim 2 was able to get to a neighbor's apartment, where the police were called.

8

19.     At approximately 6:25 a.m., the Detroit Fire Department responded to

a vehicle fire near Filer Avenue. Upon arrival, DFD found an active vehicle fire

and Victim 1 bound and tied feet away from the vehicle. Victim 1 was freed from

the restraints, transported to a hospital, and interviewed.

**ATF Investigation and Identification of Suspects**

20.     In this investigation, ATF Agents and other law enforcement have

reviewed bank records, Cash App records, surveillance video, License Plate Reader

information, phone call records, and phone call location information for phones

used by the suspects, and other records relevant to the investigation. Phone

numbers for the suspects were identified from rental car records, Cash App

records, call records with other co-conspirators, and phone company records.

Agents also obtained search warrants for historical and prospective location data

for the phone numbers for the suspects during this investigation and have observed

the suspects in locations consistent with the phone location data, further

confirming that the suspect is in fact the person using that phone. The historical

phone location discussed below is not available for every moment in time, but

generally only when the phone is in use. Thus, when I note that a person's phone

was in a location at a specified time, that is when data was available but does not

mean that is the precise time they arrived or departed from that location.

9

Additionally, I have not included every data point for every phone, but only those necessary for the purpose of establishing probable cause for these charges.

21.     Based upon a review of phone records and video evidence, ATF agents and analysts determined that LOPEZ MARTINEZ, CHATMON, and Ieasha STROMAN's cell phones were located near the victim's residence around 10:00 p.m. on August 31, 2025, hours before the kidnapping. Agents located video footage of the suspects and the white Mazda near the victim's residence at that time. The video footage shows the Mazda stopping at a liquor store near the victim's residence. LOPEZ MARTINEZ went into the liquor store, while two other individuals got out of the car, but remained near the car.



*The other two suspects are seen standing near the passenger side of the car*

22.     LOPEZ MARTINEZ, CHATMON, and Ieasha STROMAN's cell phones then returned to LOPEZ MARTINEZ's residence in Orion Township

between 11:35 p.m. and 12:15 a.m. on September 1, 2025, before later coming back to Detroit when the kidnapping was committed.

23.    After 12:15 a.m., phone location data shows LOPEZ MARTINEZ, CHATMON, Ieasha STROMAN, and Dnequia STROMAN's phones traveling together en route to Detroit. Dnequia STROMAN and Ieasha STROMAN's phones appear to turn off around 1:05 a.m., while traveling on I-75 South near Madison Heights, north of Detroit.

24.    At approximately 1:35 a.m. on September 1, 2025, LOPEZ MARTINEZ was seen on surveillance video stopping at a gas station at 18300 Morang in Detroit and going inside. At least one passenger is visible in the front seat of the car while LOPEZ MARTINEZ is inside the gas station. Location data for LOPEZ MARTINEZ's phone is consistent with her location at the gas station.

*LOPEZ MARTINEZ in the Mazda at the gas station:*



*LOPEZ MARTINEZ inside the gas station purchasing items:*

11



25.     Around 1:58 a.m., LOPEZ MARTINEZ's phone is located near

Victim 1's residence. Surveillance video shows the white Mazda parking nearby at

2:47 a.m. LOPEZ MARTINEZ is then eventually seen walking towards Victim 1's

vehicle.

26.     Around 3:05 a.m., video surveillance near Victim's 1 home shows

LOPEZ MARTINEZ getting into the passenger seat of Victim 1's 2018 GMC

Yukon Denali, and Victim 1 driving away. Shortly after driving away, the white

Mazda was seen on video turning on its headlights and following the GMC Yukon.

27.     A query of license plate readers (LPRs) revealed that a white Mazda

bearing South Carolina License Plate 389BSZ was observed at 3:18 a.m. at the I-

94 Eastbound ramp at Livernois, a short distance away from where LOPEZ

MARTINEZ initially entered Victim 1's vehicle.

28.     The same white Mazda vehicle was observed again on LPRs at 3:25

a.m., driving northbound on E. Davison at E. McNichols, a short distance from

where Victim 1 reported he parked on Filer Ave., consistent with the Mazda following the Yukon from the initial scene on Vernor Ave. to where the armed robbery and kidnapping took place on Filer Ave.

29.     Law enforcement queried the license plate for the white Mazda and found it to be registered to EAN Holdings (Enterprise), as a rental vehicle. Enterprise provided records showing the vehicle was rented to another person, and had a secondary driver listed as Leica LOPEZ MARTINEZ, and a phone number provided for LOPEZ MARTINEZ.

30.     At approximately 3:39 a.m., CHATMON's phone was located near the initial kidnapping scene on Filer Ave. Between 4:02 a.m. and 4:20 a.m., the white Mazda and Victim 1's Yukon were captured on motion-activated video on Filer Ave.

31.     Surveillance video shows Victim 1's GMC Yukon return near his residence at approximately 4:53 a.m. LOPEZ MARTINEZ's phone was located near Victim 1's residence at this time. Two suspects got out of the vehicle and entered the building where Victim 1 resided. One of the suspects, of larger build, wore a dark shirt with a large graphic visible. Minutes later, the two suspects exited the building carrying what appears to be a safe, and re-entered Victim 1's GMC Yukon.

32.   Victim 1 reported he believed some of the stops during the kidnapping were at ATMs. Victim 1 overheard conversations between the unknown suspects and he was asked for his Bank of America PIN.

33.   Victim 1's bank records showed a $1,000 withdrawal from a Bank of America ATM on Gratiot Ave. in Detroit at approximately 5:45 a.m. while Victim 1 was still tied up in the back of the GMC Yukon. The withdrawal was made by LOPEZ MARTINEZ driving Victim 1's black GMC Yukon.



*ATM Footage of the LOPEZ MARTINEZ driving Victim 1's Yukon while withdrawing money from his Bank of America account*

34.   Based upon her name being associated to the rental vehicle, members of the Detroit Arson Task Force researched LOPEZ MARTINEZ's social media accounts. They located accounts that appeared to be used by LOPEZ MARTINEZ

and found a photograph of LOPEZ MARTINEZ wearing a shirt like the one worn by the suspect. Based upon a comparison of other photos of LOPEZ MARTINEZ from her social media accounts and the surveillance from the gas station prior to the kidnapping and ATM transaction during the kidnapping, there are multiple similarities that lead me to conclude that LOPEZ MARTINEZ is the person that withdrew the funds from Victim 1's account while driving his Yukon during the kidnapping.



*Left: ATM footage; Right: Photo posted to LOPEZ MARTINEZ's social media account.*

35.     During an interview with Victim 1 by law enforcement, a photographic array was conducted in a fair, unbiased, and non-suggestive manner.

The procedure was conducted in accordance with accepted law enforcement practices to ensure reliability and impartiality. The photographs of individuals of similar appearance and characteristics were presented sequentially on paper to Victim 1. Victim 1 positively identified LOPEZ MARTINEZ as being the female he picked up on Vernor Ave. near his apartment and drove to Filer Ave., where he was kidnapped.

36.     Historical call detail records for LOPEZ MARTINEZ's phone showed that LOPEZ MARTINEZ was in contact with CHATMON's phone five times during the approximate four-hour timeframe the offenses were being committed, consistent with them traveling in tandem in the Mazda and victim's Yukon at different times, as follows:

   a.  3:10 a.m. – LOPEZ MARTINEZ called CHATMON for 29:20;

   b.  3.39 a.m. – LOPEZ MARTINEZ called CHATMON for 23:31;

   c.  4:13 a.m. – CHATMON called LOPEZ MARTINEZ for 3:06;

   d.  4:16 a.m. – LOPEZ MARTINEZ called CHATMON for 23:57;

   e.  6:14 a.m. – (9 minutes before the vehicle fire 911 call) – LOPEZ MARTINEZ called CHATMON for 1:04.

37.     Phone location records for LOPEZ MARTINEZ and CHATMON place both of them again near Filer Ave. around 6:10 a.m., shortly before the vehicle fire was reported.

38.     Victim 1's Bank of America card was used again a short time later at 7:23 am. A $400.00 withdrawal was made at the PNC Bank located at 584 N. Perry St., Pontiac, MI. A review of video surveillance from a nearby gas station revealed a white vehicle similar to the white Mazda pulled near the PNC bank at approximately 7:19 a.m. Two suspects then approached the ATM on foot and made the withdrawal. Investigators documented that one of the suspects was wearing a dark colored sweatshirt with a similar graphic on the front as observed on surveillance video during the home invasion of the victim's apartment in Detroit earlier in the evening.



*ATM Footage showing suspects approaching PNC bank ATM in Pontiac*

17



*ATM Footage showing suspects at PNC bank in Pontiac*

39.    Location data for LOPEZ MARTINEZ's phone places her in the area of the PNC Bank at the time of this withdrawal.

40.    Based upon the height, weight, build, and skin tone, of the person on video at the PNC bank wearing the NASA sweatshirt, recent surveillance of Ieasha STROMAN and Dnequia STROMAN, and recent personal observations of Ieasha STROMAN, it is my opinion that that the person in the NASA sweatshirt is Dnequia STROMAN.



*Surveillance photo of Ieasha STROMAN (left) and Dnequia STROMAN (right) from September 18, 2025*

41.     At 10:15 a.m. and 10:25 a.m., CHATMON called Kenneth ANDERSON. When CHATMON placed these calls, he was near the hotel where Ieasha STROMAN and Dnequia STROMAN have been staying for the last several weeks.

42.     Records obtained from Cash App show that at 10:54 a.m., $4,396.90 was fraudulently transferred from Victim 1's Cash App account to Kenneth ANDERSON's Cash App account. Records from Cash App show that the ANDERSON's identity was verified as the account holder from his government identification, and that the account was created in July 2025. The account was also associated with ANDERSON's phone number. At 10:57 a.m., ANDERSON then transferred $3,437.62 via Cash App to Ieasha STROMAN's Cash App Account.

43.     Agents searched social media records for STROMAN and identified a

Facebook Account for an Ieasha STROMAN that was associated to a Facebook

Account for CHATMON. Agents then located a TikTok account for Ieasha

STROMAN, "queen_stroman", also with her name listed. In 2022, Ieasha

STROMAN posted a selfie-video to TikTok showing her wearing the same

distinctive NASA hooded sweatshirt worn by the suspect at the PNC ATM in

Pontiac, shown below.



44.     Phone records for Ieasha STROMAN also show that she was in

regular contact with CHATMON throughout the month of August. On August 31,

2025, prior to the kidnapping, CHATMON's phone records show he communicated

with Ieasha STROMAN three times between 6:11 PM and 8:24 PM. CHATMON's next communication with Ieasha STROMAN was at 4:14 PM on September 1, 2025. This is consistent with CHATMON and STROMAN being together shortly before, during, and after the kidnapping.

45.     From approximately 10:45 a.m. to 11:15 a.m., phone location data from LOPEZ MARTINEZ, CHATMON, Ieasha STROMAN, and ANDERSON shows that all four phones were together near ANDERSON's residence in Pontiac, Michigan. This is the same time period that the Cash App transactions took place. Dnequia STROMAN's phone was still turned off at this time, and was not turned back on until around 11:37 a.m.

46.     Between approximately 11:30 a.m. to 11:45 a.m., phone location data for LOPEZ MARTINEZ, Ieasha STROMAN, and Dnequia STROMAN shows all of them near LOPEZ MARTINEZ's residence in Orion Township, Michigan. Location data for CHATMON's phone places him in the area at 1:39 p.m.

47.     CHATMON's phone records also show that he has been regularly in communication with ANDERSON's known phone number during the month of August and in the morning on September 1, 2025, following the kidnapping.

48.     I know from these records that these transfers necessarily used the internet, which is a means, facility, or instrumentality of interstate and foreign commerce.

49. I know from speaking to other agents with experience investigating financial crimes involving accounts with Bank of America that the withdrawal of funds from a Bank of America bank account at a Bank of America ATM in the Eastern District of Michigan involves the transmission of electronic signals via the internet, which is a means, facility, or instrumentality of interstate commerce, through one of Bank of America's two data centers, which are located in Virginia and Colorado, and from those data centers to banks and/or ATMs located in the Eastern District of Michigan.

## CHATMON's Post-Kidnapping Jail Calls

50. On September 1, 2025, CHATMON's brother called him again from jail. CHATMON laughed and said, "Where you been?" His brother then laughed and responded, "That happened, Skud?" CHATMON laughed again and said, "They done got the old YN man. . . . They done got [Victim 1] ass dawg. . . . Somebody got that n**** bro. . . . They caught the n**** with his pants down." CHATMON proceeded to give his brother details about the kidnapping of Victim 1 and Victim 2. His brother then remarked that they kidnapped Victim 1 for some "cheese he ain't even got yet?" CHATMON responded that they got him for something "light."

51. On September 6, 2025, CHATMON's brother called him again from jail. CHATMON mentioned "Dnequia" (Dnequia STROMAN) and referred to her

as being a family member. CHATMON also talked about "Leica" (LOPEZ MARTINEZ). CHATMON stated that LOPEZ MARTINEZ was "cool," but that she does "weird goofy dumb shit" and was an "air head." CHATMON then stated, "n**** had to put a little 'what's a name' together, the bitch got to just acting weird bro." CHATMON then told his brother that their mother was angry at Victim 1 about how Victim 1 had been treating Victim 2. CHATMON's brother then said that Victim 1 better "get right" or it could be another "episode." CHATMON stated he told their mother those "YNs" and "Young bitches" going to "get on his ass again." The conversation continued:

CHATMON:     Hey Twin. I'm a just say this. It was check out time, Twin.

Brother:     Damn. Straight like that.

CHATMON:     Yeah, man. So, you know, [unintelligible].

Brother:     Wow.

CHATMON:     Yeah, Twin. I just, yeah, it was check out time, cuz. *singing* We got to go. We got to go.

Brother:     Damn, Skud. That's fucked up.

CHATMON:     *laugh* I said, I know that n**** will understand me.

Brother:     That's fucked up. *laugh*

23

| | |
|---|---|
| CHATMON: | I know Twin will understand what I'm talking about cuz. That's why he Twin bitch, and ain't nobody else Twin. |
| Brother: | Man, listen man. I wish I was out. I swear to God, n****, you think that would shake out. [unintelligible]. I would have been like bitch, fuck that. Fuck what momma talkin' bout, you hear me. |
| CHATMON: | Hell yeah. |
| Brother: | I ain't gonna lie to you. Fuck it. |

**September 25, 2025, Search Warrants**

52.   On September 25, 2025, ATF agents executed federal search warrants at CHATMON's, LOPEZ MARTINEZ's, Ieasha and Dnequia STROMAN's, and ANDERSON's residences. Each defendant was present at their respective residence. Agents placed phone calls to the phone numbers for each of their phone numbers as identified as being used by them during these offenses as outlined above, and each phone was identified as being possessed by each respective suspect.

53.   At CHATMON's residence, a house in Detroit, Michigan, CHATMON was present. In a bedroom that appeared to be CHATMON's, based on other indicia of occupancy, agents found a loaded .380 caliber pistol, registered to another occupant of the residence, under a pillow on the bed. Agents also found

a zip up bag containing a bag that appeared to contain crack cocaine and marijuana. CHATMON made a statement that the everything in the bag was his.

54.     At LOPEZ MARTINEZ's residence, an apartment in Orion Township, Michigan, LOPEZ MARTINEZ was present, along with two children. LOPEZ MARTINEZ was in possession of her phone, the same phone identified as being used by her during these offenses. Agents found two firearms: (1) an Aero Precision Model X15 multi caliber rifle, loaded with 16 rounds of ammunition, located behind the bedroom dresser inside a blue bag; and (2) a loaded Charter Arms, undercover .38 special revolver, located on a bedroom closet shelf inside a paper bag. When agents made entry, LOPEZ MARTINEZ made a statement about the firearms being in her apartment, and stated she was keeping them for a friend. Agents also located clothing worn by LOPEZ MARTINEZ during the offenses, and what appears to be the black Nike hoodie and camouflage hat worn by the male suspect on video at the PNC bank ATM in Pontiac. Agents also located evidence indicating that CHATMON stayed at LOPEZ MARTINEZ's apartment from time to time.

55.     At the STROMANS' residence, a hotel room in Rochester Hills, Michigan, both Ieasha and Dnequia STROMAN were present and in possession of the phones identified as being used by each during this investigation, as outlined above. Agents located two loaded firearms in the room, under the mattress, and

black leggings, consistent with the clothing worn by the larger woman at the PNC bank ATM in Pontiac. Agents also found coins in collector cases. Victim 1 had previously advised law enforcement that such coins in collector cases were included among the items in the stolen safe. Agents also found the remains of similar coins in collector cases in the remnants of a burnt safe found inside Victim 1's burnt Yukon. Agents showed a photograph of the recovered coins from the STROMAN's hotel room to Victim 1, who identified the coins as his stolen property.

56. At ANDERSON's residence, ANDERSON was present. ANDERSON was in possession of his phone, the same phone identified as being used by him during these offenses.

## III.   CONCLUSION

57. Probable cause exists to believe that D-1 Roland Terrell CHATMON, D-2 Leica LOPEZ MARTINEZ, D-3 Ieasha Ann STROMAN, D-4 Dnequia Jenise STROMAN, and D-5 Kenneth Paul ANDERSON conspired to unlawfully seize, confine, kidnap, abduct, and carry away and hold for ransom or reward or otherwise Victim 1 and Victim 2, using any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense, and did any overt act to effect the object of that conspiracy, in violation of 18 U.S.C. § 1201(c). This violation occurred from on or about August 31, 2025, to on or about

September 1, 2025, in Detroit, in the Eastern District of Michigan.

Respectfully submitted,

Theodore L. Copley, Task Force Officer
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Sworn to before me and signed in my
presence and/or by reliable electronic means.

Honorable Anthony P. Patti
United States Magistrate Judge

Dated:  September 25, 2025

27